**EX PARTE Jaime VASQUEZ**

**NO. 01-15-00728-CR**

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued July 28, 2016

Rehearing En Banc Overruled September 13, 2016

---

Franklin Bynum, Bynum Law Office, Houston, TX, for Appellee.

Devon Anderson, District Attorney-Harris County, Alan Curry, Assistant District Attorney, Houston, TX, for State.

Panel consists of Justices Jennings, Keyes, and Bland.

## OPINION

Jane Bland, Justice

Appellant, Jaime Vasquez, appeals the denial of his application for a writ of habeas corpus filed seventeen years after his 1997 guilty plea and judgment of conviction for the offense of indecency with a child. Vasquez successfully completed six years' deferred adjudication community supervision for the offense. The trial court denied Vasquez's habeas application both on its merits and, alternatively, on the basis that the application was barred under the doctrine of laches because the delay in filing materially prejudiced the State. We affirm.

## BACKGROUND

On May 28, 1996, Vasquez was charged with the felony offenses of aggravated sexual assault of a child under 14 years of age and indecency with a child by contact.[1] Pursuant to a plea agreement, the State abandoned the aggravated sexual assault charge. Vasquez pleaded guilty to the offense of indecency with a child by contact. On March 14, 1997, in accordance with the plea agreement, the trial court entered a judgment assessing punishment at six years' deferred adjudication community supervision. Vasquez did not appeal the judgment and the judgment subsequently became final. On March 18, 2003, Vasquez fulfilled the conditions of his community supervision, and he was discharged.

---

1. *See* Tex. Penal Code Ann. §§ 21.11 (West 2011) (indecency with a child), 22.021 (West Supp. 2015) (aggravated sexual assault).

Prior to Vasquez's completing his community supervision in March 2003, a federal immigration court ordered Vasquez deported to his home country of Mexico because Vasquez was not a legal resident in the United States when he pled guilty to the offense of indecency with a child. On May 20, 2004, the Board of Immigration Appeals (BIA) affirmed the immigration court's determination that Vasquez was subject to removal.

On September 23, 2014, while in custody after attempting to reenter the United States, Vasquez filed this application for a writ of habeas corpus—seventeen years after his guilty plea and the subsequent final judgment, eleven years after being discharged from community supervision, and ten years after the BIA's final order affirming his deportation. Vasquez asserts that he is currently confined and restrained because, as a result of the 1997 judgment, he was deported, cannot legally enter or remain in the United States, and is required to register as a sex offender. In requesting habeas relief, Vasquez complains that such collateral consequences of the 1997 judgment are an illegal confinement and restraint of his liberty because (1) he is actually innocent of the crime to which he pled guilty, (2) his guilty plea was involuntarily and unintelligently entered, and (3) he received ineffective representation from his defense counsel. On August 11, 2015, the trial court denied Vasquez's habeas application. On appeal, Vasquez challenges the trial court's determination that Vasquez failed to meet his burden to show that he is entitled to relief and that his claims are barred by laches.

## DISCUSSION

In its findings of fact and conclusions of law, the trial court found that (1) Vasquez failed to demonstrate any of the three grounds for relief asserted in his habeas application and (2) to the extent that there was any merit to Vasquez's claims, the requested habeas relief was barred by laches because "determining the details of the plea bargain, discussions among parties, and reprosecuting the case-in-chief are difficult and prejudice the State."

### I. Standard of Review

Texas Code of Criminal Procedure article 11.072 establishes the procedure for an applicant to seek habeas corpus relief "from an order or a judgment of conviction ordering community supervision." TEX. CODE CRIM. PROC. ANN. art. 11.072, § 1 (West 2005). Under article 11.072, we have jurisdiction to consider appeals of denials of habeas corpus relief from such orders or judgments. Id. art. 11.072, § 8.

In reviewing a trial court's ruling on a habeas corpus application, we view the facts in the light most favorable to the trial court's ruling and uphold that ruling absent an abuse of discretion. See Ex parte Wheeler, 203 S.W.3d 317, 324 (Tex.Crim. App.2006); Kniatt v. State, 206 S.W.3d 657, 664 (Tex.Crim.App.2006). In an article 11.072 post-conviction habeas corpus proceeding, the trial judge is the sole finder of fact. See Ex parte Garcia, 353 S.W.3d 785, 788 (Tex.Crim.App.2011). Thus, in conducting our review, we defer to the trial court's factual findings when supported by the record. See Ex parte Amezquita, 223 S.W.3d 363, 367 (Tex.Crim.App.2006); Ex parte Thompson, 153 S.W.3d 416, 417–418 (Tex.Crim.App.2005). We similarly defer to the trial court's rulings on the application of the law to fact questions if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. See Ex parte Peterson, 117 S.W.3d 804, 819 (Tex.Crim.App.2003), overruled on other grounds by Ex parte Lewis, 219 S.W.3d 335 (Tex.Crim.App.2007).

### II. Actual Innocence

■ Vasquez's first ground for habeas relief alleges that he is actually innocent of the offense of indecency with a child and that the complainant "has recently come forward and recanted her original statements to the police." When asserting a claim of actual innocence based on newly discovered evidence, the evidence presented by the habeas applicant must constitute affirmative evidence of the applicant's innocence. *Ex parte Franklin*, 72 S.W.3d 671, 678 (Tex.Crim.App.2002). Not only must the habeas applicant make a truly persuasive showing of innocence, he must also prove that the evidence he relies upon is "newly discovered" or "newly available." *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim.App.2006). To succeed in an actual innocence claim, the habeas applicant must demonstrate by clear and convincing evidence that no reasonable juror would have found him guilty in light of the new evidence. *Ex parte Navarijo*, 433 S.W.3d 558, 560 (Tex.Crim.App.2014). For the reasons below, we uphold the trial court's denial of Vasquez's actual innocence claim.

## A. Newly Discovered Evidence

■ Vasquez's claim of actual innocence rests upon his assertion that complainant recently recanted her statements. A request for habeas relief on a claim of actual innocence requires that the applicant demonstrate that his claim is based upon "newly discovered" or "newly available" evidence:

Not only must the habeas applicant make a truly persuasive showing of innocence, he must also prove that the evidence he relies upon is "newly discovered" or "newly available." The term "newly discovered evidence" refers to evidence that was not known to the applicant at the time of trial and could not be known to him even with the exercise of due diligence. He cannot rely upon evidence or facts that were available at

the time of his trial, plea, or post-trial motions, such as a motion for new trial. *Brown*, 205 S.W.3d at 545; *see also Ex parte Holloway*, 413 S.W.3d 95, 97 (Tex. Crim.App.2013) ("An applicant for habeas relief based on a claim of actual innocence must demonstrate that the newly discovered evidence, if true, creates a doubt as to the correctness of the verdict sufficient to undermine confidence in the verdict and that it is probable that the verdict would be different on retrial."). Accordingly, habeas relief on Vasquez's actual innocence claim would be unavailable if the complainant's recanting was either known to the defense at the time of Vasquez's guilty plea or could have been known with proper diligence. *See Brown*, 205 S.W.3d at 545 (citing *Ex parte Briggs*, 187 S.W.3d 458, 465 (Tex.Crim.App.2005), and *Ex parte Tuley*, 109 S.W.3d 388, 403 (Tex.Crim.App. 2002)).

■ The trial court held that Vasquez failed to demonstrate any newly-discovered evidence in support of his actual innocence claims. In holding that complainant's recanting was not new evidence, the trial court found that "[a]ccording to documentation included in the State's file, [complainant] recanted to the Child Protective Services counselor, the Prosecutor and her mother, Mrs. Vasquez, prior to the date of Applicant's plea of guilty." The record contains evidence from the prosecution's file supporting the trial court's findings, including (1) a note on the inside front cover of the state's file stating that "CW recanted;" (2) a note referencing a conversation the prosecutor had with a caseworker that reads, "her impression is that CW's mom got so hysterical that CW changed story. She thinks something [between defendant and] CW happened. She didn't think CW made all this up ..... CW and her mom are very close. CW wants to go home with mom." and (3) a note from a March 13,

1997 interview of complainant by the prosecutor stating that complainant told the prosecutor that it "[did not] happen" and that "she misses her mom." Accordingly, the record contains evidence of multiple instances in which the complainant recanted before Vasquez's guilty plea in 1997.

The trial court further found that there was no evidence in the record that complainant's recanting was hidden from the defense. Rather, evidence before the trial court suggested that complainant's recanting was known to the defense or could have been known with proper diligence. At the habeas hearing, Vasquez's defense counsel initially testified that he was unaware of complainant's recanting until the habeas proceeding, but he also testified that his memory had faded and that he had no reason to believe that the prosecution withheld evidence of the complainant's recanting. Counsel subsequently confirmed that the complainant's recanting may have been the basis for obtaining dismissal of the aggravated sexual assault charge as part of the plea agreement with the State, even though counsel could not recall any discussion due to the passage of time:

> Q. Okay. And part of your plea negotiations, you were able to secure, I guess, a reduced plea on the indecency case and you got the aggravated sexual assault case dismissed?
>
> A. Yes, ma'am.
>
> Q. Okay. Do you feel that that was based on mitigating evidence that was involved; or why do you think you were able to secure that plea, if you remember?
>
> ***
>
> A. Well, the only—the only thing I could say is that there must have been some mitigating circumstances; and I don't recall, you know, whether her recanting of her testimony was involved at that time or it came along later. I couldn't tell, and

I couldn't tell by looking at the file . . . . It just says it was recanted, and so I don't know that—if that—if that came through, you know, came through to start with or later became an issue.

Because defense counsel's files have been destroyed, they are unavailable to demonstrate whether the complainant's recanting was discussed during the plea negotiations. The affidavit of Devon Anderson, the prosecutor who noted complainant's recantation in the State's file, similarly states that she cannot recall the plea discussions with defense counsel. She averred, however, that the information regarding complainant's recanting would have been made available to the defense and "likely would have been part of any plea bargaining discussion with defense counsel, as well as part of the decision to abandon the Aggravated Sexual Assault of a Child paragraph and only proceed on the lesser Indecency with a Child charged in paragraph two."

Moreover, for evidence to be considered "newly discovered evidence," it must not only be unknown by the applicant but also must not have been capable of being known with reasonable diligence. *See Brown*, 205 S.W.3d at 545. Vasquez's denial that he actually knew of the recantation does not satisfy the requirement that the recantation could not have been known with reasonable diligence. Vasquez has provided no evidence demonstrating that he could not have known that the complaining witness had recanted despite due diligence. The trial court's findings were material to determining whether complainant's recanting to her mother, who was married to Vasquez, and to other identifiable witnesses was capable of being known with reasonable diligence.

 Because some evidence supports the trial court's findings that complainant's recanting either was known or

could have been known with reasonable diligence prior to Vasquez's guilty plea in 1997, we hold the trial court did not err in finding that evidence of complainant's recanting cannot be considered newly discovered evidence supporting a claim of actual innocence. *See Brown*, 205 S.W.3d at 545. Accordingly, we uphold the trial court's denial of Vasquez's actual innocence claim for failing to demonstrate newly-discovered evidence supporting his claim of actual innocence. [2]

### B. Evidence of Innocence

██ Even if complainant's recanting is considered new evidence, it was within the trial court's province as the finder of fact to conclude that Vasquez failed to meet his burden, by clear and convincing evidence, to establish his actual innocence. The trial court had before it some evidence to find that complainant's outcries during the period of the offense and Vasquez's guilty plea were more credible than her recantation. In weighing the conflicting evidence before it, the trial court found complainant's testimony in support of Vasquez's habeas application not entirely credible.

For the reasons below, we defer to the trial court's credibility determinations because they are supported by the record. *See Ex parte Thompson*, 153 S.W.3d at 417–18.

██ A complainant's recantation of earlier outcry testimony does not destroy the probative value of that testimony. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App.1991). The fact finder is entitled to reconcile conflicts in the testimony and to disbelieve a recantation. *Id.* at 461; *see also Saldaña v. State*, 287 S.W.3d 43, 60 (Tex.App.—Corpus Christi 2008, pet. ref'd) ("Furthermore, when a witness recants prior testimony, it is up to the fact finder to determine whether to believe the original statement or the recantation. A fact finder is fully entitled to disbelieve a witness's recantation."); *Jackson v. State*, 110 S.W.3d 626, 631 (Tex.App.—Houston [14th Dist.] 2003, pet. ref'd) ("[A] criminal conviction, which requires proof beyond a reasonable doubt, may rest on hearsay despite the lack of the complainant's testimony or even the complainant's recantation.").

2. Vasquez did not raise, in either the trial court or before this Court, any failure by the State to comply with any obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Even assuming that Vasquez had raised a failure to comply with *Brady*, we note that the record contains the prosecutor's affidavit that (1) "[i]t was [her] customary habit and practice at the time to inform defense counsel of this type of information," (2) complainant's recanting "likely would have been part of any plea bargaining discussion with defense counsel, as well as part of the decision to abandon the Aggravated Sexual Assault of a Child paragraph and only proceed on the lesser Indecency with a Child charged in paragraph two," and (3) "it is, as it was then, [her] standard practice as a prosecutor to comply with any and all *Brady* requirements." Vasquez did not challenge the veracity of these statements in the trial court. The prosecutor's affidavit was found to be credible by the trial court and is further sup-

ported by defense counsel's trial testimony, stating that the complainant's recantation may have been both discussed in connection with, and the basis for, obtaining the plea agreement. Vasquez bears the burden to claim and demonstrate a *Brady* violation. *See Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim.App.2002) ("Under *Brady*, the defendant bears the burden of showing that, in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure."). This burden does not shift to the State when an applicant raises an actual innocence claim in a habeas application but remains with the habeas applicant. *See Ex parte Thomas*, 906 S.W.2d 22, 24 (Tex.Crim. App.1995) ("The burden of proof in a writ of habeas corpus is on the applicant to prove by a preponderance of the evidence his factual allegations."). Thus, we reject any contention that a *Brady* violation supports Vasquez's claim of actual innocence.

The trial court, as the trier of fact, was the judge of the credibility of the witnesses and could have chosen to believe all, some, or none of complainant's testimony recanting her claims. *See Wise v. State*, 364 S.W.3d 900, 903 (Tex.Crim.App.2012) ("The factfinder exclusively determines the weight and credibility of evidence."). When a witness recants prior testimony, the factfinder determines whether to believe the original statement or the recantation and is entitled to disbelieve a witness's recantation. *See Chambers*, 805 S.W.2d at 461 (holding that outcry evidence, even if contradicted at trial by complainant, retains probative value sufficient to prove an essential element of indecency with a child); *see also Bargas v. State*, 252 S.W.3d 876, 888 (Tex.App.—Houston [14th Dist.] 2008, no pet.) (holding that outcry testimony retains probative value even if contradictory evidence admitted); *Saldana v. State*, 287 S.W.3d 43, 60 (Tex.App.—Corpus Christi 2008, pet. ref'd) ("Furthermore, when a witness recants prior testimony, it is up to the fact finder to determine whether to believe the original statement or the recantation. A fact finder is fully entitled to disbelieve a witness's recantation."). Here, complainant's recent recantation conflicted with complainant's initial statements.

Complainant's recantation was inconsistent with her initial outcry to her mother and with multiple statements made by the complainant during the investigation of the case. In addition to complainant's initial outcry to her mother that Vasquez "sort of touched her," the record includes an April 8, 1996 police report indicating that complainant provided a detailed statement to police on March 22, 1996 in which she (1) stated that during the month of April 1995, when she was eleven years old, Vasquez "was touching her inappropriately;" (2) described at least two times that Vasquez came into her room and touched "inside her shirt" and "inside her shorts," stating

that once he "put his finger inside of her vagina and moved it around;" and (3) stated that Vasquez "sometimes smelled like he had been drinking beer." However, given the passage of time since she gave her statements to the police, complainant testified at the habeas hearing that she could not remember the specifics of what she told the police in her statement regarding the allegations against Vasquez:

Q. Then the police almost immediately get involved; and do you remember making a statement to the police the very next day, March 22, 1996?

A. I remember speaking to a few people with my mom with me.

Q. Okay.

A. But—

Q. Do you remember speaking to a detective and going over details of the abuse that you were claiming at the time?

A. I want to say that—I can't remember specifics; but, I mean, I do recall speaking with a few different people.

Q. Okay. Do you remember telling the police officers specific details about whether the lights were on or whether the lights were off during the abuse?

A. No.

Q. Okay. Do you remember making specific details about the position that you were laying in when you were speaking to the police?

A. No.

Q. Do you remember giving specific details about how the defendant—I'm sorry—how Jaime Vasquez was kneeling down next to the bed or walking into the room?

A. No. I mean, I see certain times where I could have said certain things just because the way our set-up of the house was.

Q. You don't remember the specific statements?

A. Exactly.

Q. Okay. Do you remember telling the police that Jaime Vasquez smelled like alcohol when he came into your room and would do this to you?

A. No, not really. Sorry.

Q. Okay. And do you recall telling the police that this happened many times over a one-month period?

A. No.

Q. Okay. Do you remember actually, I think, detailing four specific instances, four specific separate instances to the police, or do you just kind of remember a general picture?

A. It's more of a generality, yeah.

Complainant also testified that due to her allegations, she was removed from her home and lived with her biological father whom she did not know. She testified that when she initially recanted before Vasquez pleaded guilty, she wanted to return home with her mother and siblings rather than live with her father. Regarding her more recent recantation, complainant admitted that her family wanted Vasquez to return to the United States to care for her mother. Thus, although complainant denied it, there was evidence that the trial court could credit that (1) complainant's initial recantation was made because she did not want to live with her biological father and wanted to return home; and (2) her more recent recantation was made in an attempt to have Vasquez return to the United States to care for her mother.

In denying Vasquez's actual innocence claim, the trial court resolved the conflicting evidence and made a credibility determination to believe evidence of complainant's specific and detailed outcries provided in 1996 rather than her recent recantation. Considering the evidence, the trial court was within its discretion to conclude that complainant's recantation was not credible to overcome the specific detailed outcry she made to police. Accordingly, we defer to the court's credibility determinations because there is support in the record for the court to believe evidence of complainant's outcries and to disbelieve her conflicting testimony regarding appellant's innocence. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Thornton v. State*, 425 S.W.3d 289, 303 (Tex.Crim.App.2014).

*Ex parte Tuley* is distinguishable from this case based on the differing conclusions of the trial court as the fact finder. 109 S.W.3d 388. In *Tuley*, the habeas applicant pleaded guilty to the offense of aggravated sexual assault and was placed on deferred adjudication community supervision for ten years. *Id.* at 395. After the trial court adjudicated guilt, the applicant filed an application for writ of habeas corpus asserting actual innocence based on evidence that the complaining witness had recanted her inculpatory statements before and after the trial. *Id.* After weighing the evidence, the trial court found that the applicant had met his burden of proving actual innocence and recommended that the Court of Criminal Appeals grant habeas corpus relief. *Id.* at 397. The Court of Criminal Appeals held that "[t]he record supports a finding that the recantation in this case is more credible than the testimony at trial." *Id.* at 397. In contrast, here the trial court found complainant's outcries more credible than her recantation and denied habeas relief. Vasquez requests that we overturn the convicting court's denial of habeas relief and reject the trial court's findings regarding the credibility of the complaining witness.

Furthermore, *Tuley* involved a habeas claim under article 11.07 whereas Vasquez

asserts a habeas claim under article 11.072. An article 11.07 habeas claim is procedurally different because "our review of an article 11.072 habeas claim is more limited than that of the court of criminal appeals's review of an article 11.07 habeas claim." *Ex parte Mello*, 355 S.W.3d 827, 841 (Tex.App.—Fort Worth 2011, pet. ref'd). In *Garcia*, the Court of Criminal Appeals explained that "[t]here is at least one significant distinction between the posture of article 11.07 habeas cases" and article 11.072 habeas cases:

> In article 11.07 habeas cases, this Court is the ultimate finder of fact; the trial court's findings are not automatically binding upon us, although we usually accept them if they are supported by the record. In an article 11.072 habeas case, however, the trial judge is the sole finder of fact. There is less leeway in an article 11.072 context to disregard the findings of a trial court. Because the court of appeals and this Court are truly appellate courts in the article 11.072 context, it makes sense as a matter of logic that the *Guzman* [*v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997)] standard would control.

353 S.W.3d at 787–88 (citations omitted). In *Guzman*, the Court of Criminal Appeals held that "as a general rule, the appellate courts, including this Court, should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim.App.1997). Thus, we affirm a trial court's decision on whether to grant the relief requested in a habeas corpus application absent an abuse of discretion. *See Garcia*, 353 S.W.3d at 787. Because the trial court's findings are supported by the record and the applicant bears the burden of proof, we hold that the trial court acted within its discretion in denying the requested relief.

## III. Involuntary Plea and Ineffective Assistance of Counsel

The doctrine of laches bars habeas relief "when an applicant's unreasonable delay has prejudiced the State, thereby rendering consideration of his claim inequitable." *Ex parte Perez*, 398 S.W.3d 206, 219 (Tex.Crim.App.2013); *see also Ex Parte Smith*, 444 S.W.3d 661, 666–67 (Tex. Crim.App.2014). Since the Court of Criminal Appeals' decision in *Perez*, no "particularized showing of prejudice" is required of the State and prejudice has been broadly defined "to permit consideration of anything that places the State in a less favorable position, including prejudice to the State's ability to retry a defendant, so that a court may consider the totality of the circumstances in deciding whether to grant equitable relief." *Perez*, 398 S.W.3d at 215. Proof of prejudice is applied on a sliding scale where "the longer the delay, the less prejudice must be shown." *Id.* at 219 (citing *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir.2003)).

In denying Vasquez's habeas application on the basis of laches, the trial court found that Vasquez's "unreasonable delay in filing this claim has prejudiced the State in its ability to respond and has placed the State in a less favorable position due to the significant passage of time caused by Applicant's unreasonable delay in filing his claim." Because we uphold the trial court's denial of Vasquez's actual innocence claim on the merits, we do not reach the issue of whether his actual innocence claim was also barred by laches.

For the reasons below, we uphold the trial court's finding that Vasquez's involuntary plea and ineffective assistance of counsel claims were barred by laches. *See Ex parte Bowman*, 447 S.W.3d 887, 888

(Tex.Crim.App.2014) ("[L]aches is a question of fact and, in Art. 11.072 cases, the trial judge is the sole finder of fact.") (internal quotations omitted); *Ex parte Garcia*, 353 S.W.3d 785, 787–88 (Tex.Crim. App.2011) (unlike in Article 11.07 habeas cases, in Article 11.072 habeas cases "the trial court is the sole finder of fact" and "[t]here is less leeway in an article 11.072 context to disregard the findings of a trial court.").

## A. Unreasonable Delay in Filing

■ Although the Court of Criminal Appeals has not adopted a bright-line rule as to the amount of delay for which a habeas application should be denied due to laches, the court has recognized that a delay longer than five years after a judgment becomes final "may generally be considered unreasonable in the absence of any justification for the delay." *Perez*, 398 S.W.3d at 216 n. 12. Vasquez's habeas application was filed more than seventeen years after the judgment ordering community supervision became final and more than ten years after Vasquez was discharged from community supervision. Vasquez's application challenges a plea agreement and defense counsel's performance, which took place over seventeen years ago, and the application was filed approximately fourteen years after defense counsel's retirement from the practice of law.

As discussed above regarding Vasquez's actual innocence claim, the record contains evidence of prior instances in which the complainant recanted, including before Vasquez's guilty plea in 1997, and there is no evidence in the record that her recantation was hidden from the defense. As the trial court noted, complainant averred that "she has been proclaiming Applicant's innocence anytime the case was brought up since *before* Applicant pled guilty." (emphasis in original).

Vasquez's application argues that he is confined and restrained as a result of the 1997 judgment because he (1) was deported from the United States because he was ineligible for any immigration relief, (2) cannot legally enter or remain in the United States, and (3) is required to register as a sex offender for life. But Vasquez knew these consequences of his guilty plea at least by the time that he was deported in 2000 and his deportation was affirmed in 2004. In addition, he has been legally required to register as a sex offender since 1997. *See* TEX. CODE CRIM. PROC. ANN. arts. 62.001(6)(A) (defining "sexually violent offense" to include indecency with a child) and 62.101(a)(1) (requiring lifelong registration for sexually violent offenses) (West Supp. 2015).

Accordingly, we hold that the trial court acted within its discretion in finding that Vasquez unreasonably delayed in filing his habeas application by waiting until September 2014 to file it.

## B. Prejudice to the State

■ The trial court found that "Applicant's unreasonable delay in filing this claim has prejudiced the State in its ability to respond and has placed the State in a less favorable position due to the significant passage of time caused by Applicant's unreasonable delay in filing this claim." In evaluating prejudice to the State, "[t]he longer an applicant delays filing his application, and particularly when an applicant delays filing for much more than five years after conclusion of direct appeals, the less evidence the State must put forth in order to demonstrate prejudice." *Perez*, 398 S.W.3d at 217–18. "The rationale for this sliding-scale approach is based on the common-sense understanding that the longer a case has been delayed, the more likely it is that the reliability of a retrial has been compromised." *Id.* at 218. This approach "permit[s] courts to more broadly consider

the diminished memories of trial participants and the diminished availability of the State's evidence, both of which may often be said to occur beyond five years after a conviction becomes final." *Id.* at 216. Vasquez delayed filing his habeas application until approximately seventeen years after the judgment became final and ten years after he completed his community supervision ordered by the judgment. In light of this delay and the sliding scale applied in determining prejudice to the State, the record in this case sufficiently supports the trial court's finding that the State was materially prejudiced by Vasquez's delay.

This record support includes affidavits and testimony that the trial court found to be credible from George Delaney (Vasquez's defense counsel), Devon Anderson (the prosecutor who handled Vasquez's case), and Denise Bradley (another prosecutor who assisted in Vasquez's case). The trial court's findings regarding laches include:

> According to the credible affidavit and testimony of George Delaney, the significant passage of time has inhibited his ability to respond to Applicant's claims, both because his memory has faded over the eighteen (18) years it has taken applicant to file this Writ of Habeas Corpus and because Mr. Delaney's files have been destroyed for at least seven (7) years making it impossible for Mr. Delaney to review any documentation he may have had regarding the Applicant's claims. Mr. Delaney is only able to generally respond to Applicant's claims based on his standard practice as a defense attorney.

> According to the credible affidavit of Devon Anderson, the significant passage of time has limited her ability to respond to Applicant's claims. Mrs. Anderson has no independent recollection of this case or of any discussions related to this case with Mr. Delaney. Mrs. Anderson is able to confirm that she is one of the prosecutors that handled this case based on identifying her handwriting and her initials, "DW," throughout the file. Mrs. Anderson is only able to respond to Applicant's first ground for relief based on her notes in the file and her standard practice as a prosecutor to comply with any and all *Brady* requirements. Mrs. Anderson is unable to respond to any other claims made by the Applicant due to the significant delay in Applicant's filing.

> According to the credible affidavit of Denise Bradley, the significant passage of time has made it impossible for her to have any independent recollection of this case. She is able to say that she was assigned to the 177[th] District Court while Judge Davies was on the bench and that her name at that time was Denise Nassar, seen on the front of the State's file and on the plea paperwork. Mrs. Bradley is unable to answer any of the specific claims the Applicant has made due to the Applicant's delay in pursuing his claim.

Because the trial court's findings are supported by the record, we hold that the trial court reasonably concluded that the State had been materially prejudiced by Vasquez's delay. *See Ex parte Amezquita*, 223 S.W.3d at 367; *Ex parte Thompson*, 153 S.W.3d at 417–418. Accordingly, we uphold the trial court's ruling that Vasquez's involuntary plea and ineffective assistance of counsel claims were barred under the doctrine of laches.

## CONCLUSION

We hold that the trial court did not err in denying Vasquez's habeas application on the basis that (1) he failed to demonstrate

a claim of actual innocence and (2) his involuntary plea and ineffective assistance of counsel claims were barred by the doctrine of laches. We therefore affirm the order of the trial court.

Jennings, J. dissenting.

Terry Jennings, Justice, dissenting.

How prevalent is the phenomenon of innocent people pleading guilty? The few criminologists who have thus far investigated the phenomenon estimate that the overall rate of convicted felons as a whole is between 2 percent and 8 percent. ... [B]ut let us suppose that it is even lower, say, no more than 1 percent. When you recall that, of the 2.2 million Americans in prison, over 2 million are there because of plea bargains, we are then talking about an estimated *20,000 persons, or more, who are in prison for crimes to which they pleaded guilty but did not in fact commit.*[1].

This case illustrates just how far the State of Texas is willing to go to uphold an improperly obtained judgment against a man who is actually innocent of the crime of which he stood accused.

Appellant, Jamie Vasquez, challenges the trial court's order denying his application for a writ of habeas corpus[2] from a judgment deferring adjudication of his guilt of the offense of indecency with a child.[3] Appellant contends that he is entitled to habeas corpus relief on the grounds that he (1) is "actually innocent" of the offense, (2) entered his plea of guilty to the

offense "involuntarily and unintelligently," and (3) received ineffective assistance of counsel.

Because the majority errs in holding that the trial court did not err in denying appellant habeas corpus relief on the ground that he is actually innocent of the offense of indecency with a child, I respectfully dissent.

## Background

In his application, appellant alleges that he, in the trial court below, entered a plea of guilty to the offense of indecency with a child. And the trial court, on March 14, 1997, in accordance with appellant's plea agreement with the State, entered a judgment, deferring adjudication of his guilt and placing him on community supervision for six years. Appellant successfully completed the conditions of his community supervision, and the case against him was dismissed on March 18, 2003. However, appellant continues to suffer from the collateral consequences of his plea because he was "deported from the United States," "cannot legally enter or remain in the United States," and is "required to register as a sex offender for life."[4]

Appellant further alleges that the complainant, his step-daughter, "has recently come forward," recanting the "original statements" that she had made to law enforcement officials and admitting that he "never touched her in an inappropriate way." He asserts that he was "uninformed

---

1. Jed S. Rakoff, *Why Innocent People Plead Guilty*, N.Y. REVIEW OF BOOKS (Nov. 20, 2014), http://www.nybooks.com/articles/2014/11/20/why-innocent-peopleplead-guilty/ (emphasis added) (the Honorable Jed S. Rakoff serves as United States District Judge for Southern District of New York).

2. *See* TEX. CODE CRIM. PROC. ANN. art. 11.072, § 1 (Vernon 2015).

3. *See* TEX. PENAL CODE ANN. § 21.11(a) (Vernon 2011).

4. *See* TEX. CODE CRIM. PROC. ANN. arts. 62.001(6)(A), 62.101(a)(1) (Vernon Supp. 2015).

about the exact nature of" the complainant's allegations at the time he entered his plea and he only pleaded guilty "because his lawyer told him that was the best possible outcome in his case—but that he was never guilty."

Among several other exhibits, appellant filed with his application two affidavits made by the complainant, the affidavit of Hortencia Flores, a family friend, and two affidavits made by himself. In her initial affidavit, dated May 16, 2014, the complainant, who is now a college graduate, testified:

... [Appellant] is my stepfather.

. . . .

When I was 12 years old I told the police that [appellant] touched me in an inappropriate sexual manner.

What I told the police was not true.

. . . .

My mother was repeatedly sexually abused when she was growing up in Mexico.

When we were growing up my mother constantly told us about her sexual abuse and shared stories with me about specific instances where men would sexually abuse her . . . .

My mother also felt that her mother (my grandmother) failed her because she refused to stop the sexual assaults.

As a result, my mother was constantly obsessed over the fact that someone was going to sexually molest me and constantly asked me if I had been touched by anyone.

. . . .

[Once, my mother] started asking me if anybody had touched me.

I remember being very frustrated that my mom kept asking me this, as if she was obsessed with it.

When [my mother] asked me if [appellant] had touched me, I just said "sort of."

My mom freaked out . . . .

. . . .

I was immediately removed from my house and had to go live with my biological dad.

. . . .

This all started because my mother was absolutely obsessed over me getting sexually assaulted, to the point that she was convinced that someone had touched me.

. . . .

I basically just told my mother what she wanted to hear so that she would stop bothering me.

Before I knew it everything was out of hand. I had to talk to different people about it and my story just sort of developed because I did not want to admit that I had made it up.

. . . .

[Appellant] is innocent of the[ ] allegations.

[Appellant] did not sexually molest me in any way.

[Appellant] did not put his hand under my shirt and touch my breasts.

[Appellant] did not put his hand under my clothes and touch my vagina.

[Appellant] did not insert his finger inside my vagina.

[Appellant] never touched my breast or my vagina in a sexual manner . . . .

I've thought of many reasons to explain why I accused [appellant] of molesting me. I was afraid and confused by everything my mother constantly told me, I felt like I had no other choice, I just wanted everything to go away. But the bottom line is that [appellant] did not do to me the things I said. [Appellant] is innocent.

. . . .

[Appellant] is not guilty[.] He is innocent of the[ ] allegations.

In her supplemental affidavit, dated March 31, 2015, the complainant further testified:

It is very possible that I told the DA that [appellant] did not do anything wrong. I definitely told my counselor that I did not belong in the counseling sessions because those other girls were really molested but I wasn't. *I never talked to [appellant] about this*, however, and I have no idea if anyone else did. If I had been called to testify in a trial then I would have told the jury that [appellant] never molested me and never touched me in an inappropriate or sexual way.

... [M]e saying "kind of" [in response to my mother's question] was just part of me acting out against [appellant]. ... Although the main reason was still my frustration with [my mother's] constant questions about people touching me and my feeling like telling her something was the only way that would make her stop.

[Appellant] is not guilty. He is innocent of the[ ] allegations.

(Emphasis added.)

In her September 4, 2014 affidavit, Flores, a family friend, testified that one night "before the police charged [appellant] with a crime against [the complainant]," she asked the complainant whether appellant had ever "touched her inappropriately." And the complainant responded, "I never said that. My mom did." Flores asked this of the complainant "more than once," and each time the complainant "responded the same way." When Flores specifically asked the complainant whether appellant had "ever touched her between her legs or on her breast," she responded, "[N]o." Flores had "no idea why" the complainant's mother "went to the police."

In appellant's initial affidavit, he testified that the complainant is his "stepdaughter," he "never touched [her] in a sexual way," his wife, the complainant's mother, was "sexually abused as a child in Mexico," and she "always talked about her sexual abuse." Further, appellant testified:

I do not know much about the police allegation[s] against me in this case.

. . . .

[My lawyer] never asked me what happened or told me what the police report said.

. . . .

I never touched [the complainant's] breast or vagina in an inappropriate sexual way.

I am not guilty of sexual assault or indecency with a child.

And in his supplemental affidavit, dated April 1, 2015, appellant testified:

I am not guilty of touching [the complainant] in any sexual way. ...

... [My lawyer] *never* told me what the police report said, what the DA said, or what any of the witnesses were saying. I *never* learned these things from anyone else either . . . .

*I was never told about any conversations between [the complainant] and any person from law enforcement, the District Attorney's Office, or my lawyer's office.* All I knew is that [the complainant] had told her mother that I touched her in an inappropriate way and that I was later arrested by the police. *Nobody ever told me that [the complainant] admitted the truth to anyone ... that I never touched her inappropriately or in a sexual way.* If I had understood my right to a trial, what the police were accusing me of, and that [the complainant] had admitted I didn't do anything wrong then I would have gone to trial.

*My lawyer did not tell me about the District Attorney's file or the police report.*

I did not know that Hortencia Flores and Sofia Flores (Aviles) remembered any incident at their house. ... I've also [now] been told that *Hortencia talked to [the complainant] that night and [the complainant] told her that I had not done anything wrong. None of this was told to me back when I was going to court.* If I had understood my right to trial, what the police were accusing me of, and that Hortencia and Sofia were able to testify for me then I would have gone to trial.

(Emphasis added.)

At the hearing on appellant's application, the defense attorney, who handled appellant's plea, testified in regard to his knowledge of the complainant's recantation. Specifically, he testified that he could not recall "any specific conversations with the State prosecutors in [appellant's] case," and he had no memory of "ever being able to look at the State's file in [appellant's case]" or "discuss[ing] the State's file with prosecutors." And, in general, during his representations of criminal defendants, the State would *"[n]ot"* always make its "file available to" him for his "review." (Emphasis added.) Further, the defense attorney testified:

I was completely unaware that in [appellant's] particular case that the complaining witness had ... changed her mind about the whole thing.

. . . .

I didn't know that until I got the case here just recently [related to appellant's habeas proceedings].

. . . .

... I'm just saying that [recently] was the first time I saw that she had, you know ... recanted her case.

The defense attorney also explained that "if [he] had seen a note that the complaining witness [had] recanted" during that time he was representing appellant, he would have "told everybody" because a recantation would have been "a major piece of evidence" and the "strongest" defense for appellant to have.

In the "Findings of Fact" section of the "Court's Proposed Findings of Fact[ ] [and] Conclusions of Law,"[5] the trial court, "based on [the] testimony and/or [the] documentary evidence" presented to the court, specifically found, "proven by a preponderance of the evidence," the following facts:

[The complainant's mother] talked to [her] children about sexual molestation much more frequently than most parents would, to the point that she often made the children watch videos about date rape and severely limited [the complainant]'s ability to spend time with any males once [the complainant] reached a certain age.

. . . .

[Appellant] was arrested based upon a statement by [the complainant] to [her mother] that he "sort of" touched her.

[The complainant] made the statement after [her mother] once again confronted her about sexual molestation.

[The complainant's mother] began listing all of the males in [the complainant]'s household, to which [the complainant] replied "no" until responding "sort of" when [the complainant's mother] said [appellant]'s name.

---

5. The "Court's Proposed Findings of Fact[ ] [and] Conclusions of Law" are attached as an appendix to this dissenting opinion.

Pursuant to [the complainant]'s statement, [her mother] called the police.

. . . .

[Appellant's lawyer]'s general practice would have been to look at the State's file *if* it was made available to him . . . .

. . . .

United States District Judge Sim Lake recently found that, in light of [the complainant]'s and [her mother]'s affidavits, as well as other affidavits and documents that have been submitted to this Court, *the judgment in this case significantly overstates the seriousness of [appellant]'s conviction.*

(Emphasis added.)

In the "Conclusions of Law" section of the "Court's Proposed Findings of Fact[ ] [and] Conclusions of Law," the trial court stated:

The court does not find the testimony of [the complainant] or [her mother] to be entirely credible nor persuasive. The Court finds [appellant]'s *claims* are incredibly self-serving. . . .

[The complainant]'s *recantation* is not new evidence.

. . . .

According to documentation included in the State's file, [the complainant] recanted to the Child Protective Services counselor, the Prosecutor and her mother . . . prior to the date of [appellant]'s plea of guilty.

. . . [T]he prosecutor . . . wrote "CW recanted" on the inside of the State's file, in plain view.

. . . .

There is no indication from the evidence that [the complainant]'s recantation was hidden from the defense.

There is no indication from the evidence that [the complainant]'s recantation was solely in the possession of the State of Texas.

[Appellant] failed to demonstrate that there is newly-discovered evidence.

Based on these conclusions, the trial court denied appellant habeas corpus relief on the ground that he is actually innocent.

Further, in the "Findings Under the Doctrine of Laches" section of the "Court's Proposed Findings of Fact[ ] [and] Conclusions of Law," the trial court specifically stated:

According to the testimony of [the complainant], [appellant] and the family have been dealing with this issue consistently since [he] was charged in 1996. In 1996 or 1997, [the complainant] was removed from [appellant]'s home where she had lived all her life. In 2003, [appellant] was deported from the United States. . . . Most significantly, [the complainant] stated that she has been proclaiming [appellant]'s innocence anytime the case was brought up since *before* [appellant] pled guilty.

[Appellant]'s unreasonable delay in filing this claim has prejudiced the State in its ability to respond and has placed the State in a less favorable position due to the significant passage of time caused by [appellant]'s unreasonable delay in filing this claim.

## Standard of Review

Generally, an applicant seeking post-conviction habeas corpus relief must prove his claims by a preponderance of the evidence. *Ex parte Richardson*, 70 S.W.3d 865, 870 (Tex.Crim.App.2002). However, in regard to a claim of actual innocence, "the applicant must prove by clear and convincing evidence that no reasonable juror would have convicted the applicant" in light of newly discovered or newly available evidence. *Ex parte Tuley*, 109 S.W.3d 388, 390 (Tex.Crim.App.2002).

In reviewing a trial court's decision to deny habeas relief, we view the facts in the light most favorable to the trial court's ruling. *Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex.Crim.App.2003), *overruled in part on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex.Crim.App.2007). We afford almost total deference to the trial court's findings of fact that are supported by the record, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Ex parte Amezquita*, 223 S.W.3d 363, 367 (Tex. Crim.App.2006). We afford the same deference to the trial court's rulings on "application of law to fact questions" if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Peterson*, 117 S.W.3d at 819 (internal quotations omitted). In such instances, we use an abuse-of-discretion standard. *See Ex parte Garcia*, 353 S.W.3d 785, 787–88 (Tex. Crim.App.2011). However, if the resolution of those ultimate questions turns on an application of legal standards absent any credibility issue, we review the determination de novo. *Peterson*, 117 S.W.3d at 819.

## Actual Innocence

In his application, appellant first argues that he is entitled to habeas corpus relief, i.e., a new trial, because "[n]o rational factfinder would have found [him] guilty in light of th[e] new evidence" of his actual innocence that he filed with the trial court. *See Ex parte Chavez*, 213 S.W.3d 320, 322 (Tex.Crim.App.2006) ("[A] bare claim of actual innocence is cognizable in state post-conviction habeas corpus proceedings.").

As the Texas Court of Criminal Appeals has explained:

There are two types of actual innocence claims that may be raised in a collateral attack on a conviction. A bare innocence claim, or *Herrera* type[6] claim[,] "involves a substantive claim in which [the] applicant asserts his bare claim of innocence based solely on newly discovered evidence." The other actual innocence claim, a *Schlup*-type[7] claim, we explained "is a procedural claim in which [the] applicant's claim of innocence does not provide a basis for relief, but is tied to a showing of constitutional error at trial."

*Tuley*, 109 S.W.3d at 390 (internal citations omitted).

The fact that a defendant actually pleaded guilty to committing an offense does not preclude him from making an actual-innocence claim via an application for a writ of habeas corpus. *Id.* at 389, 391–92. As emphasized by the court of criminal appeals:

We address cognizable claims in habeas proceedings regardless of the plea in the case. We are unpersuaded that equitable principles should prevent an innocent person from obtaining the relief simply because he pleaded guilty. *There is nothing equitable about permitting an innocent person to remain in prison when he produces new evidence that unquestionably shows that he did not commit the offense for which he is incarcerated.*

*Id.* at 392 (emphasis added).

In *Tuley*, the court specifically explained that a bare-innocence claim is cognizable through an application for writ of habeas corpus. *Id.* at 390 (citing *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex.Crim.App. 1996)). Because "[i]ncarceration of an innocent person offends federal due process," a bare-innocence claim necessarily "raises a

---

**6.** *See Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

**7.** *See Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

constitutional challenge to the conviction." *Id.* (citing *Elizondo,* 947 S.W.2d at 205). However, the court also noted that a conviction should not be "overturned lightly" and the burden on the applicant, "who has had error-free proceedings," is exceedingly heavy to take into account society's and the State's interest in finality. *Id.* (citing *Elizondo,* 947 S.W.2d at 208).

Thus, to be granted relief on an actual-innocence claim, the applicant must show that the new evidence "unquestionably establishes his innocence." *Id.* (citing *Elizondo,* 947 S.W.2d at 208–09). And the court interpreted this to mean that "the applicant must prove by clear and convincing evidence that no reasonable juror would have convicted the applicant in light of the new evidence." *Id.* (citing *Elizondo,* 947 S.W.2d at 209). To determine whether a habeas applicant has reached this level of proof, "the convicting court weighs the evidence of the applicant's guilt against the new evidence of innocence." *Id.* (citing *Elizondo,* 947 S.W.2d at 207).

In regard to an actual-innocence claim, the crucial and ultimate issue is "whether the newly discovered evidence would have convinced the jury of the applicant's innocence." *Elizondo,* 947 S.W.2d at 207. The court noted this in the context of the case, in which a jury had decided a defendant's guilt. *Tuley,* 109 S.W.3d at 390. But it also explained that an actual-innocence claim is not an attack on a jury's verdict; rather, "[w]hat [the applicant] wants is a new trial based on newly discovered evidence which he claims proves his innocence." *Id.* (second alteration in original) (internal quotations omitted) (quoting *Elizondo,* 947 S.W.2d at 209). Thus, the policy supporting the court's holding that the punishment of an innocent person violates federal due process, "is the same for an applicant regardless of whether his case was heard by a judge or jury or whether he pleaded guilty or not guilty." *Id.* at 390–91 (citing *Elizondo,* 947 S.W.2d at 209).

The court in *Tuley* further explained that the "purpose of criminal proceedings is to separate the guilty from the innocent." *Id.* at 392 (citing *Herrera v. Collins,* 506 U.S. 390, 398, 113 S.Ct. 853, 859, 122 L.Ed.2d 203 (1993)). And it recognized the indisputable and sad fact that,

*[f]rom time to time[,] something goes awry in the process by which a defendant is convicted, for example, when a complainant makes false charges.*[8] The error occurs within the judicial system though it happened through no fault of the convicting court or the parties. It is

---

8. By way of example, the Innocence Project of Texas estimates that between 547 and 5420 wrongful felony convictions occur annually in Texas. *Wrongful Convictions in Texas,* Innocence Project of Tex., http://www.ipoftexas. org/wrongful-convictions/problem/ (last visited July 28, 2016); *see also Ex parte Panetti,* 450 S.W.3d 144, 146 (Tex.Crim.App.2014) (Price, J., dissenting) (noting "society is now less convinced of the absolute accuracy of the criminal justice system" and Texas "ranks ... number three nationally in wrongful convictions over the last twenty-four years"). Further, in 2015, Texas had the most exonerations of any state nationwide. *See* The National Registry of Exonerations, *Exonerations in 2015,* The Nat'l Registry of Exonerations 5

(Feb. 3, 2016), http://www.law.umich.edu/ special/exoneration/Documents/Exonerations_ in_2014_report.pdf. Notably, of the fifty-seven criminal defendants exonerated in Texas in 2015, fifty-four of them had pleaded guilty to the criminal offenses for which they were later exonerated. *See Exoneration Detail List,* The Nat'l Registry of Exonerations, http:// www.law.umich.edu/special/exoneration/ Pages/detaillist.aspx?View=#FAF6EDDB-5A 68-4F8F-8A52-2C61F5BF9EA7' & Filter Field1=Exonerated& FilterValue1=8_2015 & FilterField2=ST& FilterValue2=TX (last visited July 28, 2016); *see also Exonerations in 2015, supra,* at 8 (explaining nationwide sixty-five of the 148 criminal defendants exonerated in 2015 had "pled guilty")

appropriate for the judicial system to correct the error through habeas corpus. *Id.* (emphasis added). And it also emphasized:

> The guilty plea process is not perfect.[9] But guilty pleas allow the parties to avoid the uncertainties of litigation. *The decision to plead guilty, as we have seen in this case, may be influenced by factors that have nothing to do with the defendant's guilt.* The inability to disprove the State's case, the inability to afford counsel, the inability to afford bail, family obligations, the need to return to work, and other considerations may influence a defendant's choice to plead guilty or go to trial. *Being aware of these considerations, we will not preclude actual innocence claims because*

*the conviction was the result of a guilty plea.*

*Id.* at 393 (emphasis added) (footnote omitted).

In *Tuley*, the habeas corpus applicant, Tuley, pleaded guilty to the offense of aggravated sexual assault, and the trial court accepted the plea, deferred adjudication of his guilt, and placed him on community supervision for ten years. *Id.* at 395. More than four years later, after the trial court had, upon the State's motion, adjudicated his guilt, Tuley filed his application for a writ of habeas corpus, alleging that he had "learned that the complainant in his case had consistently recanted her allegations *since before his trial.*" *Id.* (emphasis added). To support the recantation, Tuley submitted affidavits from the complainant,

---

9. As Judge Rakoff has explained in regard to the guilty-plea process:

> In the majority of criminal cases, a defense lawyer only meets [his] client when or shortly after the client is arrested, so that, at the outset, [he] is at a considerable informational disadvantage to the prosecutor. If, as is very often the case (despite the constitutional prohibition of "excessive bail"), bail is set so high that the client is detained, the defense lawyer has only modest opportunities, within the limited visiting hours and other arduous restrictions imposed by most jails, to interview [his] client and find out [the client's] version of the facts.
>
> The prosecutor, by contrast, will typically have a full police report, complete with witness interviews and other evidence, ... forensic test reports, and follow-up investigations. ...
>
> Against this background, the information-deprived defense lawyer, typically within a few days after the arrest, meets with the overconfident prosecutor, who makes clear that, unless the case can be promptly resolved by a plea bargain, he intends to charge the defendant with the most severe offense he can prove. ... If, however, the defendant wants to plead guilty, the prosecutor will offer him a considerably reduced charge—but only if the plea is agreed to promptly .... Otherwise, he will charge the

> maximum, and, while he will not close the door to any later plea bargain, it will be to a higher-level offense than the one offered at the outset of the case.
>
> In this typical situation, the prosecutor has all of the advantages. He knows a lot about the case ..., whereas the defense lawyer knows very little. ...
>
> ....
>
> The defense lawyer understands this fully, and so [he] recognizes that the best outcome for [his] client is likely to be an early plea bargain, while the prosecutor is still willing to accept a plea to a relatively low-level offense. ...
>
> ....
>
> It is not difficult to perceive why this [is] so. After all, the typical person accused of a crime combines a troubled past with limited resources: he thus recognizes that, even if he is innocent, his chances of mounting an effective defense at trial may be modest at best. If his lawyer can obtain a plea bargain that will reduce his likely time in prison, he may find it "rational" to take the plea.
>
> Rakoff, *supra* note 1 (noting ninety-seven percent of "federal criminal charges [that are not dismissed] ... [are] resolved through plea bargains," and "it is [in] a rare state where plea bargains do not similarly account for the resolution of at least 95 percent of the felony cases that are not dismissed").

her best friend, A.S., and her boyfriend, B.G. *Id.*

In reaching its decision, the court of criminal appeals noted:

> [Tuley]'s newly discovered evidence includes affidavits and testimony that the complainant *recanted* her allegations *almost immediately after making the allegation[s] and that during the time between the allegation[s] and the trial, the complainant consistently—to her friends—denied the truth of the allegation[s].* This is corroborated by affidavits from A.S. and B.G.
>
> In her affidavit and testimony at the habeas evidentiary hearing, A.S. explained that two to three days after the complainant made her allegations, the complainant told her that the allegations were not true. Before trial, the complainant confided to A.S. that she was worried that her testimony would not be believed. After testifying, the complainant told A.S. that she thought her testimony had gone well and that she thought she had been convincing.
>
> B.G.'s affidavit notes that he heard about the allegations from the complainant's mother. He said that when he talked to the complainant about the allegations, she told him that they were not true and that she fabricated the charges because she hated [Tuley] and wanted him to leave. As the trial approached, B.G. tried to convince the complainant that she should stop lying about the charges. The complainant became angry with B.G. and accused him of being disloyal.
>
> In the complainant's affidavits, she explains why she fabricated the charge[s] against [Tuley]. She explained that [Tuley]'s abuse of her mother, the drug use by [Tuley] and her mother, her mother's claims that [Tuley] was unfaithful, and personal disagreements between herself and [Tuley], among other reasons led her to fabricate the charges. Her explanations about whom she told about the fabrication and when are consistent with the affidavits of A.S. and B.G.
>
> According to her affidavit, the complainant did not plan the fabrication. Her mother asked her whether [Tuley] has ever done anything to her. She told her mother that [he] had sexually assaulted her. At the trial, she explained, she wove the allegations of sexual assault into events that had actually occurred. She said she pretended to cry when she found out [Tuley] received community supervision. She decided to recant officially several months after she received letters from B.G. explaining that [Tuley] had gone to prison.

*Id.* at 395–96.

After thoroughly reviewing the evidence, the court of criminal appeals held that the record "support[ed] a finding that the recantation in th[e] case [was] more credible than the testimony at trial." *Id.* at 397. It emphasized that the affidavits of the complainant, B.G., and A.S., as well as the testimony of A.S. at the habeas hearing, contradicted the complainant's testimony at trial and "constitute[d] affirmative evidence of [Tuley's] innocence." *Id.* Thus, the court of criminal appeals, "convinced by clear and convincing evidence that no rational jury would convict [Tuley] in light of the *new evidence*," granted him habeas corpus relief.[10] *Id.* (emphasis added).

---

10. To distinguish *Tuley*, the majority notes that Tuley sought post-conviction relief under article 11.07. *See Ex Parte Tuley*, 109 S.W.3d 388, 390 (Tex.Crim.App.2002). As the majority states, "[a]n article 11.07 habeas claim is procedurally different" from appellant's "habeas claim under article 11.072" because in an article 11.072 habeas proceeding the trial court is the sole finder of fact. *See* Tex. Code Crim. Proc. Ann. arts. 11.07, 11.072 (Vernon

Here, likewise, appellant presented to the trial court below affirmative, uncontradicted, and compelling evidence that he is actually innocent of the offense of indecency with a child. First and foremost, the complainant, in her May 16, 2014 affidavit, testified that when she was twelve years old, she falsely stated to her mother that appellant, her step-father, had "sort of" touched her in an inappropriate sexual manner. She explained that when she was "growing up," her mother "constantly told [the complainant] about her sexual abuse and shared stories with [the complainant] about specific instances where men would sexually abuse her" and she "felt that her mother ([the complainant's] grandmother) failed her because she refused to stop the sexual assaults."

The complainant, who is now a college graduate, further explained that because her "mother was constantly obsessed over the fact that someone was going to sexually molest [the complainant] and constantly asked [her] if [she] had been touched by anyone," she, on one occasion, when asked by her mother whether appellant had touched her, "just said 'sort of.'" This "freaked out" her mother, who then contacted law enforcement officials. And the complainant was "immediately removed from [her] house and had to go live with [her] biological dad."

In her March 31, 2015 supplemental affidavit, the complainant further testified that it was "very possible that [she had] told the DA that [appellant] did not do anything wrong." In fact, she told her counselor that she "did not belong in the counseling sessions because those other girls were really molested but [she] wasn't." However, the complainant, who had been removed from her home with her

mother and appellant, "never talked to [appellant] about this." And had she been called to testify in a trial, she would have told the jury that appellant had "never molested [her] and [had] never touched [her] in an inappropriate or sexual way." She emphasized that appellant "is not guilty. He is innocent of the[ ] allegations."

In her affidavit, dated September 4, 2014, Flores explained that one night, "before the police charged [appellant] with a crime against [the complainant]," she asked the complainant whether appellant had "touched her inappropriately." And the complainant responded, "I never said that. My mom did." Further, when Flores specifically asked the complainant whether appellant had "ever touched her between her legs or on her breast," she responded, "[N]o."

In his April 1, 2015 supplemental affidavit, appellant testified that he is "not guilty of touching [the complainant] in any sexual way" and he "was never told about any conversations between [the complainant] and any person from law enforcement, the District Attorney's Office, or [his] lawyer's office." "All" he "knew" was that the complainant "had told her mother that [he had] touched her in an inappropriate way and that [he] was later arrested by the police." In fact, "[n]obody ever told [him] that [the complainant] admitted the truth to anyone ... that [he] never touched her inappropriately or in a sexual way." Moreover, his defense attorney "did not tell [him] about the District Attorney's file or the police report."

Appellant also "did not know that Hortencia Flores and Sofia Flores (Aviles) remembered any incident at their house." Specifically, although he had recently been

---

2015). However, although the majority represents that "here the trial court found [the] complainant's outcries more credible than

her recantation," the trial court, in fact, made no such finding. *See infra.*

informed that Flores had "talked to [the complainant one] night and [the complainant] told her that [he] had not done anything wrong," "[n]one of this was told to [him] back when [he] was going to court." Had he understood his right to trial, what the law enforcement officers were accusing him of, and that Flores was able to testify for him, he would have then "gone to trial."

Appellant's habeas corpus evidence, which is similar to that presented in *Tuley*, supports a finding that the complainant's recantation in this case is more credible than his plea of guilty. *See* 109 S.W.3d at 397. The affidavit testimony of the complainant, Flores, and appellant completely contradict his guilty plea and constitute affirmative evidence of appellant's innocence. *See id.* Thus, appellant presented clear and convincing evidence that no rational jury would convict him in light of the new evidence. *See id.* And the trial court erred in denying appellant habeas corpus relief on his actual-innocence claim. *See id.*

As noted above, we, as an appellate court, afford *almost* total deference to the trial court's findings of fact that are *supported by the record*, especially when the trial court's fact findings are based on an *evaluation of credibility and demeanor*. *Amezquita*, 223 S.W.3d at 367. And we afford the same deference to the trial court's rulings on "application of law to fact questions" if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Peterson*, 117 S.W.3d at 819 (internal quotations omitted). In such instances, we use an abuse-of-discretion standard. *See Garcia*, 353 S.W.3d at 787–88. However, if the resolution of those ultimate questions turns on an application of legal standards absent any credibility issue, we review the determination de novo. *Peterson*, 117 S.W.3d at 819.

Here, the trial court below did enter certain "Findings of Fact"; however, many of the trial court's actual fact findings support the ultimate conclusion that no rational jury would convict appellant in light of the new evidence that he presented to the trial court. In other words, the trial court specifically found facts, as testified to by the complainant, that support an ultimate finding that she fabricated her allegation that appellant had "sort of" touched her. For example, the trial court found:

> [The complainant's mother] talked to [her] children about sexual molestation much more frequently than most parents would, to the point that she often made the children watch videos about date rape and severely limited [the complainant]'s ability to spend time with any males once [the complainant] reached a certain age.
>
> . . . .
>
> [Appellant] was arrested based upon a statement by [the complainant] to [her mother] that he "sort of" touched her.
>
> [The complainant] made the statement after [her mother] once again confronted her about sexual molestation.
>
> [The complainant's mother] began listing all of the males in [the complainant]'s household, to which [the complainant] replied "no" until responding "sort of" when [the complainant's mother] said [appellant]'s name.
>
> Pursuant to [the complainant]'s statement, [her mother] called the police.
>
> . . . .
>
> United States District Judge Sim Lake recently found that, in light of [the complainant]'s and [her mother]'s affidavits, as well as other affidavits and documents that have been submitted to this Court, the judgment in this case significantly overstates the seriousness of [appellant]'s conviction.

Further, many of the trial court's so-called "[f]indings" do not constitute fact findings at all; rather, they are non sequiturs. For example, in the "Conclusions of Law" section of the "Court's Proposed Findings of Fact[ ] [and] Conclusions of Law," the trial court specifically stated:

> The Court finds [appellant]'s *claims* are incredibly self-serving.
>
> . . . .
>
> There is no indication from the evidence that [the complainant]'s recantation was hidden from the defense.
>
> There is no indication from the evidence that [the complainant]'s recantation was solely in the possession of the State of Texas.

(Emphasis added.)

First, rather than addressing any specific portion of appellant's actual affidavit testimony, the trial court merely concluded that his "*claims* are incredibly self-serving." (Emphasis added.) Of course appellant's "claims" are "self-serving." He is attempting to obtain a new trial based on his claims of actual innocence, involuntary plea, and ineffective assistance of counsel. However, in stating the obvious, the trial court simply did not state whether it found any specific portion of appellant's testimony to be not true or not credible.

Second, it is of no material consequence that there "is no indication from the evi-

dence" that the complainant's recantation "was hidden from the defense" or "was solely in the possession of the State." The relevant fact is that *there is no evidence* in the record that appellant, prior to entering his plea of guilty, had been in any way informed that the complainant had recanted her statement that he had touched her in an inappropriate and sexual manner. This is particularly troubling given the State's affirmative duty to disclose evidence that is favorable and material to the defense.[11] *See Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963); *Thomas v. State*, 841 S.W.2d 399, 407 (Tex.Crim.App.1992); *see also* TEX. CODE CRIM. PROC. ANN. art. 39.14(h) (Vernon Supp. 2015) (applicable to prosecutions of offenses committed on or after January 1, 2014 and codifying State's affirmative duty under *Brady*). The fact that there is no evidence that the State hid the complainant's recantation from appellant does not support an inference that he was somehow made aware of it, or could have discovered it on his own with reasonable diligence,[12] and yet chose to enter a guilty plea regardless of this critical fact. What is painfully obvious, however, is that there is simply *no evidence* to which the State can point demonstrating that it actually fulfilled its affirmative duty and provided the recantation evidence to the defense.[13]

11. Contrary to the majority's characterization, I am not "conten[ding]" that a *Brady* violation supports [appellant]'s claim of actual innocence."

12. The majority, in reaching its holding that the trial court did not err in denying appellant habeas corpus relief on his actual-innocence claim, represents that the trial court found that the "complainant's recanting either was known or could have been known with reasonable diligence prior to [appellant]'s guilty plea in 1997." However, the trial court made no such finding, and there is no evidence in the record that would support such a finding.

13. *See* Randall Sims & R. Marc Ranc, *Two Views of Morton*, 77 TEX. B.J. 964, 966 (Dec. 2014) (noting in regard to certain district attorney's offices in Texas prior to 2013, criminal defense attorneys "[p]ersonally looking at any of the reports or other statements that the [S]tate had in its possession was out of the question; if you were lucky, you might get the opportunity three or four days before trial *to* sit down and look over some of the reports," but "if your client did not want a trial, then there were possibly reports, evidence, and statements to which you may never have had access—another problem in and of itself in

The trial court also did not make other important credibility determinations. For example, the trial court, in the "Conclusions of Law" section of the "Court's Proposed Findings of Fact[ ] [and] Conclusions of Law," stated:

> The court does not find the testimony of [the complainant] or [her mother] to be *entirely* credible nor persuasive.

(Emphasis added.) Again, the trial court simply failed to state whether it found any specific portion of the testimony of the complainant or her mother to be untrue. Clearly, the trial court actually believed the majority of the complainant's testimony because it specifically found, as noted above, facts that actually support the ultimate conclusion that no rational jury would convict appellant in light of the new evidence that he presented to the trial court.

Finally, many of the trial court's findings are simply not supported by the actual record evidence. For example, the trial court, also in the "Conclusions of Law" section of the "Court's Proposed Findings

of Fact[ ] [and] Conclusions of Law," stated:

> [The complainant]'s recantation is not new evidence.
>
> . . . .
>
> [Appellant] failed to demonstrate that there is newly-discovered evidence.

In making these statements, it appears that the trial court erroneously reasoned that simply because the State, as illustrated by the notation inside of its file, was aware that the complainant had "recanted," appellant must also have been aware of the recantation prior to entering his plea of guilty. Thus, as per the trial court, the recantation is not new evidence and appellant did not demonstrate that there is newly discovered evidence.

Again, there is simply *no evidence* in the record that appellant had been in any way made aware of the complainant's recantation prior to entering his plea of guilty.[14] In fact, as noted above, appellant clearly testified to the contrary, and the trial court made no finding as to whether it found appellant's specific testimony to be credible or not credible. Appellant also

---

trying to negotiate a fair plea deal''); Tex. Def. Serv. & Tex. Appleseed, *Improving Discovery in Criminal Cases in Texas: How Best Practices Contribute to Greater Justice* 1, 5 (2013), http://texasdefender.org/wp-content/uploads/ tds_report.pdf (noting "lack of uniformity in discovery policies" between district attorneys' offices in Texas "makes access to justice dependent, in part, on where a defendant is charged"; "[d]iscovery rules vary between Texas counties and sometimes within a single district attorney's office"; "[n]ot all Texas' district attorneys' offices utilize open file policies"; and "Texas' limited discovery laws may increase the likelihood of wrongful convictions and *Brady* violations" (emphasis omitted)); Timothy Cole Advisory Panel on Wrongful Convictions, *Report to the Texas Task Force on Indigent Defense* 23 (Aug. 2010), http://tidc. texas.gov/media/25663/ FINALTCAPreport.pdf ("Discovery … is especially important in helping to guard against wrongful convictions.").

14. The majority points to the following as evidence in the record "supporting" the trial court's findings: (1) "a note on the inside front cover of the [S]tate's file stating that 'CW recanted'"; (2) "a note referencing a conversation the prosecutor had with a caseworker that reads 'her impression is that CW's mom got so hysterical that CW changed story. She thinks something [between defendant and] CW happened. She didn't think CW made all this up …. CW and her mom are very close. CW wants to go home with mom'"; and (3) "a note from a March 13, 1997 interview of [the] complainant by the prosecutor stating that [the] complainant told the prosecutor that it '[did not] happen' and that 'she misses her mom.'" But, *none* of this "evidence" supports the inference that appellant was made aware of the complainant's recantation prior to entering his plea of guilty.

clearly testified that he did not know that the complainant had admitted to Flores that he had not inappropriately touched her in a sexual manner. The fact that such evidence was, at some point in time, in existence does not mean that it was actually available to appellant or that it was not newly discovered or newly available when he later learned of its existence.

This could not be made more clear than by the testimony of appellant's defense attorney, who had no memory of "being able to look at the State's file," or "discuss[ing] the State's file with the prosecutors," and who stated that the State would "*[n]ot*" always make its file "available" to him for "review" when he was representing criminal defendants. (Emphasis added.) Further, he even testified that he was "completely unaware" that in appellant's case the complainant had "changed her mind" and "recanted." It was not until the recent habeas corpus proceedings that the defense attorney "saw" that the complainant had "recanted." And he explained that had he known about the complainant's recantation at the time appellant entered his plea, he "would have told everybody [he] could [have] t[old]" because a recantation is "a major piece of evidence" and the "strongest" defense for appellant to have.

As explained by the Honorable Tom Price and the Honorable Cathy Cochran in their Opinion Concurring in the Denial of the State's Motion for Rehearing in *Tuley*:

> The fact that there was some evidence at the time of [Tuley]'s trial that could have been used to impeach the complainant, *does not mean that her affidavit recanting her trial testimony is not new evidence that affirmatively demonstrates [Tuley]'s innocence.*
>
> There was some evidence available at the time of trial that indicated that the complainant lied about her allegations. The complainant herself explained that

she told her boyfriend that she had lied about the allegations. Also, the boyfriend testified outside the presence of the jury that the complainant told him that she had lied about the allegations. This evidence attacked the complainant's credibility; it was not affirmative evidence of innocence.

> *Now [Tuley] presents the complainant's affidavit that no sexual assault ever occurred. This is affirmative evidence of innocence.* And, it is supported by the boyfriend's affidavit and the affidavit and testimony of the complainant's best friend. *This is new evidence of innocence.* The suggestion to the contrary is not persuasive.

109 S.W.3d at 403 (Price, J., joined by Cochran, J., concurring in denial of State's motion for rehearing) (emphasis added).

In sum, many of the trial court's actual fact findings support the ultimate conclusion that no rational jury would convict appellant in light of the new evidence that he presented to the trial court. The trial court did not make important credibility determinations, and many of the trial court's findings are simply not supported by the actual record evidence. Moreover, many of the trial court's so-called "[f]indings" do not constitute findings at all. Ultimately, in regard to appellant's actual-innocence claim, the trial court based its denial of appellant's application for a writ of habeas corpus on its fundamental legal misunderstanding of what constitutes "newly" discovered or available evidence. Thus, the trial court's decision denying appellant's application for habeas corpus relief on the ground of actual innocence is subject to de novo review. *See Peterson*, 117 S.W.3d at 819.

A thorough review of the record in this case reveals that the affidavit testimony of the complainant, who is now a college graduate and who was twelve years old at

the time she fabricated her allegations against appellant under intense psychological pressure from her mother, that appellant did not touch her in an inappropriate and sexual manner constitutes clear and convincing evidence more credible than appellant's plea of guilty. *See Tuley*, 109 S.W.3d at 397. Her testimony and that of Flores also constitute affirmative evidence of appellant's actual innocence. *See id.* And the record evidence reveals that the details of the complainant's testimony and that of Flores is in fact newly discovered and newly available.

Accordingly, I would hold that no rational jury would convict appellant in light of the new evidence, and I would grant appellant habeas corpus relief on his claim of actual innocence. *See id.*

### Laches

In the "Findings Under the Doctrine of Laches" section of the "Court's Proposed Findings of Fact[ ] [and] Conclusions of Law," the trial court also specifically stated:

> According to the testimony of [the complainant], [appellant] and the family have been dealing with this issue consistently since [he] was charged in 1996. In 1996 or 1997, [the complainant] was removed from [appellant]'s home where she had lived all her life. In 2003, [appellant] was deported from the United States. ... Most significantly, [the complainant] stated that she has been proclaiming [appellant]'s innocence anytime the case was brought up since *before* [appellant] pled guilty.
>
> [Appellant]'s unreasonable delay in filing this claim has prejudiced the State in its ability to respond and has placed the State in a less favorable position due to the significant passage of time caused by [appellant]'s unreasonable delay in filing this claim.

Here, the trial court erred in concluding that the State may rely upon the doctrine of laches to preclude a habeas corpus applicant from presenting a claim of actual innocence based on newly discovered or newly available evidence. *Ex parte Perez*, 398 S.W.3d 206, 218 (Tex.Crim.App.2013). As revealed by the extensive discussions of the doctrine by the Texas Court of Criminal Appeals, it simply is not pertinent to such a claim.

The Texas Constitution expressly provides: "The writ of habeas corpus is a writ of right, and shall never be suspended." TEX. CONST. art. I, § 12. However, the Texas Court of Criminal Appeals, in 1999, "agree[d] with the State that the doctrine of laches is a theory which [the court] may, and should, employ in [its] determination of whether to grant [habeas] relief in any given 11.07 case." *Ex parte Carrio*, 992 S.W.2d 486, 488 (Tex.Crim.App.1999); *see* TEX. CODE CRIM. PROC. ANN. art. 11.07 (Vernon 2015). Relying on former rule 9(a) of the Rules Governing Section 2254 Cases in the United States District Courts and federal case law interpreting it, the court noted that in federal court it was "the burden of the State 'to (1) make a particularized showing of prejudice, (2) show that the prejudice was caused by the petitioner having filed a late petition, and (3) show that the petitioner has not acted with reasonable diligence as a matter of law.' " *Carrio*, 992 S.W.2d at 488 (emphasis omitted) (quoting *Walters v. Scott*, 21 F.3d 683, 686–87 (5th Cir.1994)). And "the type of prejudice the State must show is prejudice in its ability to respond to the allegations in the petition." *Id.* at 488 (citing *Walters*, 21 F.3d at 687). The court also noted that if the State made "its showing of these elements, it [was] then the burden of the petitioner, in federal court, to show either that the state actually ha[d] not been prejudiced or that the petitioner's delay [was]

justified under the rule." *Id.* (citing *Walters*, 21 F.3d at 687).

In 2013, the Texas Court of Criminal Appeals stated that after it had, in *Carrio*, "implicitly" adopted "the federal laches standard" of rule 9(a) and federal case law interpreting it, "the State's [laches] burden has been impossibly high primarily due to the requirement that the State make a particularized showing of prejudice to its ability to respond to the [habeas corpus] application." *Perez*, 398 S.W.3d at 212–14. Because the court concluded that "the federal laches standard" it had adopted had proven to be "ineffective at weeding out stale claims in Texas post-conviction cases," it "abandon[ed] that formulaic standard in favor of the more flexible common-law approach to laches in the post-conviction context." *Id.* at 214–15. Thus, the court of criminal appeals eased the State's burden in habeas corpus cases by adopting "Texas common law, rather than the federal standard, to define the parameters" of the defense of laches "in Texas habeas corpus cases." *Id.* at 215. As the court stated:

> Consistent with the common-law doctrine of laches, going forward, we will (1) no longer require the State to make a "particularized showing of prejudice" so that courts may more broadly consider material prejudice resulting from delay, and (2) expand the definition of prejudice under the existing laches doctrine to permit consideration of anything that places the State in a less favorable position, including prejudice to the State's ability to retry a defendant, so that a court may consider the totality of the circumstances in deciding whether to grant equitable relief.

*Id.* (citing *Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex.1998)).

The common-law doctrine of laches is defined as:

> [N]eglect to assert right or claim which, taken together with lapse of time and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity. Also, it is the neglect for an unreasonable and unexplained length of time under circumstances permitting diligence, to do what in law, should have been done.

*Carrio*, 992 S.W.2d at 487 n. 2 (internal quotations omitted) (quoting *Laches*, BLACK'S LAW DICTIONARY (6th ed. 1990)). In Texas civil cases, laches is an affirmative defense that must be pleaded by the party asserting it. *See* TEX. R. CIV. P. 94. And "[l]aches is a question of fact that should be determined by considering all of the circumstances in each particular case." *In re Mabray*, 355 S.W.3d 16, 22–23 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding [mand. denied] ).

In *Perez*, the court of criminal appeals explained that the defense of laches "typically requires proof by a preponderance of the evidence of two elements: unreasonable delay by the opposing party and prejudice resulting from the delay." 398 S.W.3d at 210 n. 3 (citing *Caldwell*, 975 S.W.2d at 538; *Gulf, Colo. & Santa Fee Ry. Co. v. McBride*, 159 Tex. 442, 322 S.W.2d 492, 500 (1958)). Thus, the defense of laches will bar habeas corpus relief "when an applicant's unreasonable delay has prejudiced the State, thereby rendering consideration of his claim inequitable." *Id.* at 219 (citing *Carrio*, 992 S.W.2d at 487).

In determining the issue of laches in habeas corpus cases, courts are to consider the totality of the circumstances, i.e., "factors such as the length of the applicant's delay in filing the application, the reasons for the delay, and the degree and type of prejudice resulting from the delay." *Id.* at 217. In regard to prejudice, "a court may draw reasonable inferences from the cir-

cumstantial evidence to determine whether excessive delay has likely compromised the reliability of a retrial." *Id.* However, even if the State presents proof of prejudice, a court still "must then weigh that prejudice against any equitable considerations that militate in favor of granting habeas relief." *Id.*

In regard to the degree of proof required, "the extent of the prejudice the State must show bears an inverse relationship to the length of the applicant's delay." *Id.* Thus, "the longer an applicant delays filing his application, and particularly when an applicant delays filing for much more than five years after [the] conclusion of direct appeals, the less evidence the State must put forth in order to demonstrate prejudice." *Id.* at 217–18. Although a delay of more than five years "may generally be considered unreasonable in the absence of any justification for the delay," the court refused "to adopt a rebuttable presumption of prejudice to the State after [any] specified period of time." *Id.* at 210, 216 n. 12.

In summing up its "expan[sion] [of] the scope of the prejudice inquiry," the Texas Court of Criminal Appeals was careful to emphasize that it was "leav[ing] intact the equitable principles" that necessarily defeat the State's reliance upon the defense of laches when a record reveals:

- an applicant's delay was not unreasonable because it was due to a justifiable excuse or excusable neglect;
- the State would not be materially prejudiced as a result of the delay; or
- *the applicant is entitled to equitable relief for other compelling reasons, such as new evidence that shows he is actually innocent of the offense* or, in

some cases, that he is reasonably likely to prevail on the merits.

*Id.* at 218 (emphasis added).

Because appellant presented to the trial court a claim that he is entitled to equitable relief on the ground that newly discovered or newly available evidence shows that he is actually innocent of the offense of indecency with a child, the State may not rely on the equitable doctrine of laches to preclude the claim. *Id.* As succinctly explained by the Texas Court of Criminal Appeals in *Tuley*:

There is *nothing* equitable about permitting an innocent person to remain in prison when he produces new evidence that unquestionably shows that he did not commit the offense for which he is incarcerated.

109 S.W.3d at 392 (emphasis added).

However, even if the law were to allow the State to rely on the doctrine of laches to preclude an innocent person relief despite the fact that he has produced new evidence that unquestionably shows that he did not commit the offense of which he was accused, the State here failed to present any evidence that it would be *materially prejudiced* by any unreasonable delay of appellant in asserting his claim of actual innocence.

The majority claims [15] that "the record in this case sufficiently supports the trial court's finding" that:

[Appellant]'s *unreasonable delay* in filing this claim has prejudiced the State in its ability to respond and has placed the State in a less favorable position *due to the significant passage of time caused by [appellant]'s unreasonable delay* in filing this claim.

---

15. While the majority addresses the doctrine of laches only in regard to appellant's claims of involuntary plea and ineffective assistance of counsel, the trial court did not limit its findings to those claims.

(Emphasis added.) However, in making this circular finding, the trial court simply conflated unreasonable delay with material prejudice.

Again, the court of criminal appeals, as it emphasized in *Perez*, expressly refused "to adopt a rebuttable presumption of prejudice to the State after [any] specified period of time." 398 S.W.3d at 210. The court did explain that "the longer an applicant delays filing his application, and particularly when an applicant delays filing for much more than five years after conclusion of direct appeals, the less evidence the State must put forth in order to demonstrate prejudice." *Id.* at 217–18. However, the State, in asserting the defense of laches must necessarily present *some evidence* of material prejudice actually caused by an unreasonable delay.

Standing alone, the mere fact that the underlying facts of appellant's case are many years old does not serve to establish material prejudice to the State in either responding to appellant's claims or retrying its case against appellant.[16] Rather, the proper consideration in regard to prejudice is "the degree and type of prejudice resulting from the delay," i.e., "whether excessive delay has likely compromised the reliability of a retrial." *Id.* at 217. And even when the State presents some proof of prejudice, a court still "must then weigh that prejudice against any equitable considerations that militate in favor of granting habeas relief." *Id.*

Here, the bottom line is that the State's ability to retry appellant for the offense of indecency with a child has in no way been prejudiced by appellant's delay in asserting his claim of actual innocence. The witnesses, including the complainant, that were available to testify for the State in 1997 are still available to testify today. And the reliability of a retrial of appellant has in no way been compromised by the passage of time. Indeed, given the simplicity of the complainant's allegations and appellant's defense, this case could have been retried in a matter of a few hours. Instead, it has been pending since appellant filed his application for a writ of habeas corpus on September 23, 2014.

### Conclusion

I would hold that no rational jury would convict appellant in light of his new evidence, and I would grant appellant habeas corpus relief, i.e., a new trial, on his claim of actual innocence. The majority in holding to the contrary is in serious error.

### Appendix

### No. 0720173–A

### EX PARTE JAIME VASQUEZ

### IN THE 177th DISTRICT COURT OF HARRIS COUNTY, TEXAS

### COURT'S PROPOSED FINDING OF FACT, CONCLUSIONS OF LAW, AND ORDER

The Court, having considered the applicant's application for writ of habeas corpus, the respondent's answer, all exhibits attached to said documents or filed in relation to said documents, and official court documents and records in cause numbers 720173 and 720173-A, including the hear-

---

16. Although the trial court found that the primary prosecutor involved in appellant's case was "only able to respond to [appellant's actual-innocence claim] based on her notes in the file and her standard practice as a prosecutor to comply with any and all *Brady* requirements," a prosecutor would more likely than not have to refer to such notes and practice in response to any actual-innocence claim, regardless of the passage of a few years or many. In any event, it is clear that the State in fact has the ability to respond to appellant's actual-innocence claim.

ing on the instant application, makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### Procedural History

1. The State charged applicant with aggravated sexual assault of a child and indecency with a child in cause number 720173, in the 177th District Court of Harris County, Texas.

 a. The State originally charged applicant in a single indictment with: (1) aggravated sexual assault by intentionally and knowingly causing the penetration of the female sexual organ of Krystal Stephanie Rocha, a child younger than fourteen, by placing his finger in her sexual organ; and (2) indecency with a child by contact by intentionally and knowingly touching the genitals of Rocha, a child younger than seventeen and not his spouse, with the intent to arouse and gratify his sexual desires.

2. On March 14, 1997, applicant pled guilty to the felony offense of indecency with a child by contact.

3. The court deferred any finding of guilt and placed applicant on community supervision for 6 years.

4. There was no direct appeal.

5. Applicant successfully completed community supervision and this Court terminated it on March 18, 2003.

6. The Applicant is "confined and restrained" as a result of the instant conviction because he "(1) was deported from the United States because he was ineligible for any immigration relief; (2) cannot legally enter or remain in the United States' and (3) is required to register as a sex offender for life." *Application for Writ of Habeas Corpus at 2.*

7. A Federal Immigration Court ordered applicant removed from the United States to Mexico on April 17, 2000. *Applicant's Exhibit 5.*

8. Applicant appealed the order of removal. On May 20, 2004 the U.S. Department of Justice denied Applicant's motion and affirm the Immigration Judge's determination that the Applicant is subject to removal. The Order states,

 The [Applicant] argues that he has not been "convicted" within the meaning of the Act...The [Applicant's] deferred adjudication is a conviction under the Act; the [Applicant] has given no other indication that his plea was anything other than a knowing, intelligent and voluntary one. The remaining appellate argument raised by the [Applicant] is unconvincing and meritless.

9. Applicant filed the instant application on September 23, 2014.

### Factual History

10. The Court finds the following facts proven by a preponderance of evidence based on testimony and/or documentary evidence filed with the clerk or filed during the hearing on the instant application, including applicant's exhibits filed under seal:

 **a. Background**

 i. Krystal is Maria's daughter. Her father has never been active in her life.

 ii. Maria is married to applicant and has been married to applicant since long before the instant allegation arose.

 iii. Maria has two sons that are both older than Krystal—Ernest Ro-

cha ("Ernest") and Erik Rocha ("Eric").

iv. Applicant has been Krystal's father figure since she was around two years old.

v. Applicant began living with Maria and the children when Krystal was very young.

vi. Maria talked to the children about sexual molestation much more frequently than most parents would, to the point that she often made the children watch videos about date rape and severely limited Krystal's ability to spend time with any males once Krystal reached a certain age.

**b. Arrest**

i. Applicant was arrested based upon a statement by his step-daughter to Maria that he "sort of" touched her.

ii. Krystal made the statement after Maria once again confronted her about sexual molestation.

iii. Maria began listing all of the males in Krystal's household, to which Krystal replied "no" until responding "sort of" when Maria said applicant's name.

iv. Pursuant to Krystal's statement, Maria called the police.

**c. Charges, plea, and subsequent information**

i. Applicant spoke Spanish, and some English, when he was arrested.

ii. Applicant's pretrial interview indicates it was conducted in English.

iii. Maria hired Delaney to represent applicant because Delaney

had assisted someone she knew with a legal issue.

iv. Delaney does not speak, and has never spoken, Spanish.

v. Delaney recalls appearing in court for applicant.

vi. Delaney recalls that sometimes he would just reset applicant's case and leave, and other times he would review the State's file if the State made it available.

vii. Despite Delaney's inability to remember the details of applicant's case, he testified about his general practice at the relevant time.

viii. Delaney's general practice would have been to look at the State's file if it was made available to him and tell his client what he was charged with.

ix. Delaney was asked to explain the tasks he would have generally done to investigate a charge like applicant's.

x. United States District Judge Sim Lake recently found that, in light of Krystal's and Maria's affidavits, as well as other affidavits and documents that have been submitted to this Court, the judgment in this case significantly overstates the seriousness of applicant's conviction.

d. Applicant was in federal custody, and then deported and out of the country, for years between his plea and the date he filed the instant application. The applicant filed the instant habeas application on September 23, 2014, seventeen (17) years after his plea of guilty and the complainant's initial recantation, fourteen (14) years after De-

fense Counsel stopped practicing law and ten (10) years after the Federal Court's final order.

## CONCLUSIONS OF LAW

The court does not find the testimony of Krystal Stephanie Rocha or Maria Esther Vasquez to be entirely credible nor persuasive. The Court finds Applicant's claims are incredibly self-serving. The Court finds George Delany credible, yet not entirely beneficial because of his destruction of records in this case, and his recollection.

1. Krystal's recantation is not new evidence.

2. Krystal makes inconsistent statements regarding when and to whom she told about her recantation.

3. According to documentation included in the State's file, Krystal recanted to the Child Protective Services counselor, the Prosecutor and her mother, Mrs. Vasquez, prior to the date of Applicant's plea of guilty.

4. According to the credible affidavit of Devon Anderson, Mrs. Anderson is the prosecutor who interviewed the Complainant on March 13, 1997, prior to the Applicant's plea of guilty, as evidenced by her handwriting and her initials "DW." Mrs. Anderson is the prosecutor who wrote "CW recanted" on the inside of the State's file, in plain view.

5. According to Maria's testimony, Maria is the individual who hired Mr. Delaney. She was in communication with Delaney. At least twice, Delaney went out to Maria's home. She knew that her daughter recanted and doubted that the sexual abuse occurred. Maria has always wanted Applicant home with her.

6. According to documentation in the State's file Maria told the Prosecutors as well as the Child Protective Services on several separate occasions that she is in denial about the crime, that the sexual abuse did not occur, that she thinks Krystal is lying and that the complainant recanted.

7. Maria's affidavit is in direct contradiction to her testimony and to the State's file.

8. There is no indication from the evidence that Krystal's recantation was hidden from the defense.

9. There is no indication from the evidence that Krystal's recantation was solely in the possession of the State of Texas.

10. The applicant failed to demonstrate that there is newly-discovered evidence.

### Applicant's First Ground for relief is denied.

Applicant is unable to show that Delany was ineffective. Delany's testimony, prosecutor affidavits, pretrial paperwork and the plea papers shed little to no light on the claims raised by Applicant. He is unable to meet his burden on these grounds. Most persuasive to the Court is the affidavit from Denise Bradley, which reads in part:

"Judge Davies was very thorough during pleas of guilty, making sure the person standing in front of her understood the allegations against them, the rights they were giving up and the effect a plea of guilty may have. If there was any indication that the person did not understand what was going on at any time it is [Denise Bradley's] belief based on [her] experience with Judge Davies that [Judge Davies] would have corrected the problem immediately."

**Applicant's Second and Third Grounds for Relief are denied.**

If however, a reviewing Court finds that there is merit to the claims made by the Applicant, the Court finds that under the doctrine of Laches, determining the details of the plea bargain, discussions among parties, and reprosecuting the case-in-chief are difficult and prejudice the State. "Given the nature of habeas corpus relief, it is reasonable to permit a court to consider whether an applicant has slept on his rights and, if he has, how that has affected the State, and whether, in light of the delay, it is fair and just to grant him relief." Ex Parte Perez, 398 S.W.3d 206, 218–19 (Tex.Crim.App.2013).

## FINDINGS UNDER THE DOCTRINE OF LACHES

1. According to the credible affidavit and testimony of George Delaney, the significant passage of time has inhibited his ability to respond to Applicant's claims, both because his memory has faded over the eighteen (18) years it has taken applicant to file this Writ of Habeas Corpus and because Mr. Delaney's files have been destroyed for at least seven (7) years making it impossible for Mr. Delaney to review any documentation he may have had regarding the Applicant's claims. Mr. Delaney is only able to generally respond to Applicant's claims based on his standard practice as a defense attorney.

2. According to the credible affidavit of Devon Anderson, the significant passage of time has limited her ability to respond to Applicant's claims. Mrs. Anderson has no independent recollection of this case or of any discussions related to this case with Mr. Delaney. Mrs. Anderson is able to confirm that she is one of the prosecutors that handled this case based on identifying her handwriting and her initials, "DW," throughout the file. Mrs. Anderson is only able to respond to Applicant's first ground for relief based on her notes in the file and her standard practice as a prosecutor to comply with any and all *Brady* requirements. Mrs. Anderson is unable to respond to any other claims made by the Applicant due to the significant delay in Applicant's filing.

3. According to the credible affidavit of Denise Bradley, the significant passage of time has made it impossible for her to have any independent recollection of this case. She is able to say that she was assigned to the 177th District Court while Judge Davies was on the bench and that her name at that time was Denise Nassar, seen on the front of the State's file and on the plea paperwork. Mrs. Bradley is unable to answer any of the specific claims the Applicant has made due to the Applicant's delay in pursuing his claim.

4. According to the testimony of Krystal, the Applicant and the family have been dealing with this issue consistently since the Applicant was charged in 1996. In 1996 or 1997, Ms. Rocha was removed from the Applicant's home where she had lived all her life. In 2003, the Applicant was deported from the United States. Ms. Rocha indicated this event was "devastating" to her and her family, as they thought everything was over. Ms. Rocha testified that she was involved in the federal proceedings and did submit a letter on behalf of the Applicant. Ms. Rocha stated the claim was "hopeless." Most significantly, Ms. Rocha stated that she has been

proclaiming Applicant's innocence anytime the case was brought up since *before* Applicant pled guilty.

5. Applicant's unreasonable delay in filing this claim has prejudiced the State in its ability to respond and has placed the State in a less favorable position due to the significant passage of time caused by Applicant's unreasonable delay in filing this claim.

In the alternative, **Applicant's claim for habeas relief is denied based on the equitable Doctrine of Laches.**

Therefore, the Court finds that relief is denied on all grounds.

BY THE FOLLOWING SIGNATURE, THE COURT ADOPTS APPLICANT'S

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CAUSE NO. 720173-A.

Date: 8/11/15

/s/ Ryan Patrick

HON. RYAN PATRICK

Presiding Judge

177th District Court

Harris County, Texas